IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DONALD E. GARDNER, III,        :
AIS #283161,                   :
    Plaintiff,              :
                               :
vs.                            :        CIVIL ACTION 14-184-KD-M
                               :
SHERIFF MACK, *et al.,*        :
    Defendants.             :
                               :

REPORT AND RECOMMENDATION

This action under 42 U.S.C. § 1983 brought by an

Alabama prison inmate, Donald E. Gardner, III, proceeding

*pro se* and *in forma pauperis,* was referred to the

undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local

Rule 72.2(c)(4), and is now before the Court on Plaintiff's

Complaint (Doc. 9), and Defendants Sheriff Mack, Cpl.

Johnson, Officer Rowell, Cpl. Robinson, Sgt. Means, and

Officer Scott's Answer and Special Report.[1] (Docs. 24, 25).

The Court has converted these documents into a Motion for

_____

    [1] On the first page of Plaintiff's Complaint, he lists
Cpl. McCall as a Defendant, but he does not name Cpl.
McCall as a Defendant in section III. B., of the Complaint;
counsel for defense includes Cpl. McCall in the Answer and
Special Report; however, the Court does not treat Cpl.
McCall as a named Defendant since he or she does not appear
in the proper section of the Complaint.  However, to the
extent that any claims are indeed alleged against Cpl.
McCall, this Report and Recommendation applies to those
claims, as well as any other stray or rogue allegations
against other officials mentioned in Plaintiff's diatribe
to the undersigned.

Summary Judgment (Doc. 14), and, after consideration of such, and for the reasons set out below, it is recommended that Defendants' Motion for Summary Judgment be granted and that all claims asserted against them by Plaintiff be dismissed with prejudice, and that judgment be entered in favor of Defendants and against Plaintiff.

## I.    Facts and Proceedings

As a preliminary matter, the Court notes, and Defendants point out, that Plaintiff originally filed his seventy-three-plus count, sixty-four page Complaint on an outdated form, and without the $350 filing fee or a motion for leave to proceed without prepayment of fees.  (Doc. 1). Plaintiff was accordingly ordered to file his complaint on an updated form in conjunction with the proper filing fee or motion for leave to proceed without the prepayment of fees.  (Doc. 2).  Plaintiff was advised in the order that the new complaint would wholly supersede the old complaint and that he shall not rely on the former filing.  (*Id.*). Plaintiff failed to comply with this specific instruction, and instead filled out the updated form referring to his originally filed complaint throughout the new form with a Motion to Convert Plaintiff's Initial/Prior Complaint Into Plaintiff's "New" Complaint.  (Doc. 4).  Plaintiff also requested leave to proceed without prepayment of fees.

(Doc. 6).  The Court granted Plaintiff's request to proceed without the prepayment of fees, but denied his motion to convert the old complaint into the new complaint.  (Doc. 7).  Plaintiff eventually filed a properly formatted Complaint (Doc. 9), on which Defendants were served and are now before the Court on their Answer and Special Report that the Court converted into a Motion for Summary Judgment.  (Docs. 24, 25, 26).

In reviewing Plaintiff's Complaint, the Court found Plaintiff's Complaint to be a poor "copy-and-paste," near-nonsensical compilation of allegations seemingly from other filings from other cases, all of which may or may not be directly related to the claims Plaintiff purports in the present action.  In their brief, Defendants also notate these same inconsistencies, and ask that the Court dismiss Plaintiff's Complaint for failure to comply with the Court's previous orders.  (Doc. 25 at 2).  Though a failure to comply with this Court's orders is a ground for automatic dismissal, the Court will nonetheless cipher through Plaintiff's claims, resolving them as the law applies thereto.  As Defendants, Plaintiff names, Sheriff Mack, Cpl. Johnson, Officer Rowell, Cpl. Robinson, Sgt. Means, and Officer Scott.  (Doc. 9 at 12-14).

At the time of the events in question, Plaintiff was being housed at the Baldwin County Jail awaiting sentencing and his prison assignment with the Alabama Department of Corrections ("ALDOC"). Apparently, since filing this Complaint, Plaintiff has been assigned to Fountain Correctional Facility in Atmore, Alabama where he presently resides. The Court has discerned from both parties' submissions that Plaintiff's allegations stem from three separate incidences wherein jail officials were forced to remove Plaintiff from his cell for disciplinary reasons.

Plaintiff was first booked into the jail on June 7, 2011; he was released on July 14, 2011, but rearrested on September 7, 2011, remaining incarcerated at the jail until May 1, 2012, when ALDOC obtained custody of him. (Doc. 25 at 3-4). During his stay at the jail, Plaintiff was a problem inmate incurring multiple disciplinary infractions, which eventually led Plaintiff to sharing a cell with inmate Brent Jacoby, who was also an extremely troubled and difficult inmate. (Doc. 25-2 at 2).

As their total body of evidence, Defendants submit each officer's affidavit, Plaintiff's booking documents, audio and video clips of the interviews between jail officials and Plaintiff, as well as audio and video clips of the altercations involving Plaintiff, plus the documents

and disciplinary/incident reports related to each altercation.

The audio and video clips were submitted on two compact discs, Exhibit F and Exhibit H. On Exhibit F, there are three audio and video recorded interviews of Plaintiff being led by Investigator Griffith. Though it is unclear to the Court whether each meeting took place before or after the altercations, the Court finds the timing of the meetings irrelevant. Rather, it is the substance of the meeting and the way the jail officials treated Plaintiff that bear the most weight on Plaintiff's Complaint.

On Exhibit H, there are three audio and video clips of each altercation involving Plaintiff. Plaintiff contends in each recording and throughout the Complaint that his treatment during the events was unconstitutional. However, Defendants' video submissions depict Plaintiff's treatment differently, and nowhere near unconstitutional. For that reason, the Court relied heavily on the evidentiary materials submitted by Defendants, as we found Plaintiff's recollection of the events to be a convoluted, near nonsensical account of the events, presented through mis-numbered pages and paragraphs throughout the entire Complaint. (*See generally* Doc. 9).

On Exhibit F, the Court gathers that at least one interview took place before the altercations, and one interview maybe took place after, though none of the interviews are clearly dated. In the first interview, prior to the initial altercation,[2] Plaintiff sent a letter to Sheriff Mack regarding multiple issues that concerned him at the jail. It is jail policy and procedure to investigate grievances and requests, such as Plaintiff's, by the appropriate staff member with the lowest level of command, with appeals climbing the chain of command ending with Sheriff Mack. (Doc. 25-1 at 3). Investigator Griffith, along with other jail officials, responded to and personally met with Plaintiff to discuss his concerns. This meeting was held in a conference room with a table and chairs, with Plaintiff sitting at the end of the table, and the other officials seated along either side of the table. A respectful and considerate conversation was had between Investigator Griffith, the other jail officials and Plaintiff. (*See* Ex. F). This respect and consideration is recurrent throughout all three recorded interviews submitted by Defendants. (*Id.*). The interviews covered a

---

[2] Defendants state that this interview took place on April 13, 2012, approximately ten days before the first altercation between jail officers and Plaintiff. (*See* Affidavit of Huey Hoss Mack, Doc. 25-1 at 4).

long, itemized list of Plaintiff's menial concerns including: access to "good" soap and other toiletery items through commissary, access to paper, envelopes and pens for legal endeavors, whether jail guards speak sternly or tenderly to inmates at the jail, why Plaintiff does not have access to a designated mental health care specialist, why there is not a rabbi on staff to bless his meals and approve them as kosher, why there is not a rabbi available to him to lead him in his Jewish faith and "religiously cleanse" him, why his food gets cold before he receives it, why there is not a "shower crew" designated to clean the showers since inmates don't want to clean the showers themselves, why he can't get extra towels, why there are roaches and ants in the jail, why he can't be in a cell alone instead of with other inmates who claim to have murdered people, why he can't utilize a "kiosk" to place orders for items from the canteen, why the air vents are caked with dust and "dander," and why there is no air conditioning in E-dorm, among many other complaints from Plaintiff. (*See Id.*). Though no violations were found regarding *any* of Plaintiff's laundry list of complaints, Plaintiff was nonetheless given an opportunity to suggest a remedy for each item that was discussed, which he did. The officials noted that that some of the suggested remedies

7

were not feasible (due to federal, state and county laws, budget constraints and availability of volunteers for religious services, etc.), but that some of his suggestions could potentially be incorporated at the jail. (*Id.*).

Concluding the meeting, the jail officials asked Plaintiff if he was satisfied with how the meeting proceeded, whether he was satisfied with the officials' agreement to implement some of the feasible remedies Plaintiff suggested, and whether Plaintiff felt like he was treated fairly and listened to by the officials, to which Plaintiff gave a resounding positive response indicating how appreciative he was of them taking their time to sit down with him and go over his complaints. The jail officials even extended sincere apologies to Plaintiff regarding his feelings of mistreatment and discontent during his stay at the Baldwin County Jail. Plaintiff shook each official's hand as the meeting wrapped up and thanked them for their efforts.

The second interview covered similar topics, and was conducted in a similar question-and-answer, respectful manner. The third interview appears to take place after the physical altercations, as he questions whether he is being recorded and indicates that he does not wish to be recorded talking about the events that had occurred. This

interview likewise covers similar topics as the first two, and is conducted in the same question-and-answer, respectful manner.

The audio and video evidence of the first altercation, which apparently took place on April 23, 2014, shows a number of officers approaching Plaintiff's cell in response to him banging on his cell door excessively asking to speak to a sergeant. (*See* Ex. H, Track 1). As the officers reached his cell, Plaintiff ducked under a blanket in near-fetal position while still yelling to see a sergeant. (*Id.*). As the officers opened his cell to pull him out, Plaintiff went limp, becoming dead weight and dragged the blanket out of the cell with him. Plaintiff continued to refuse to cooperate and held the blanket over his head as the officers attempted to pull it off of him. To achieve Plaintiff's compliance, he was maced in the head/neck area until he cooperated. At this point, Plaintiff is laying on his belly with his hands cuffed behind his back and shouting that "this is unconstitutional treatment, man, f***! . . . I'm not resisting! . . . Y'all [sic] want to f*** with me, man, I didn't do s***! I was not resisting! I want a sergeant!" (*Id.*). The officers then lifted Plaintiff to his feet and walked him to a water closet to be decontaminated from the mace. Plaintiff alleges in the

Complaint that the closet was filthy and smelled of dirty
mop water and that he did not want to be decontaminated
with dirty mop water when he could be rinsed off at an eye
fountain down the hall.  The Court acknowledges that there
were mop buckets stored in the closet where Plaintiff
refused decontamination, but we also note that, on the
video, the closet was well lit and did not appear to be
unclean or unkempt.  The officers instructed Plaintiff to
bend over toward the faucet so he could be decontaminated
from the mace, but Plaintiff refused, belligerently
stating, "I want a rag to wipe my face.  Don't spray my
face.  Don't spray my face!"  (*Id.*).  Plaintiff was then
walked out of the water closet and placed in a restraint
chair, still yelling that he didn't want his face sprayed,
and that he wanted to speak a sergeant.  (*Id.*).  The
officers asked him again if he wanted to be decontaminated
and Plaintiff said yes; the officers loosed the restraints,
and escorted him back to the closet where Plaintiff again
became hostile because he didn't want to be decontaminated
with water from the "mop sink" because it is where "filth
and dark, nasty, used mop water goes and is not sanitary."
(Doc. 1 at 5).  Plaintiff contends repeatedly in the
Complaint that he "did not want water from the mopsink
[sic] sprayed in his eyes or on him at all; as Plaintiff

knows the water would be unsanitary and that medical has an
eyewash fountain which is specifically designed for washing
chemicals out of the eyes."  (*Id.*).

Plaintiff was then decontaminated with the running
water from the sink in the water closet.  Based on the
video evidence, the water faucet over which Plaintiff
protested did not appear to be particularly unsanitary, or
unsanitary at all.  There were indeed mop buckets in the
closet, but the water used to decontaminate Plaintiff was
fresh from the tap- just as it would be from any other
faucet in the building.  The room was well lit and there
did not appear to be anything wrong with the water when
Plaintiff was hosed down for decontamination.  Plaintiff's
face never touched the surface of the sink, nor did his
hands as they were cuffed up to the back.

Plaintiff became even more volatile toward the team of
officers after he was decontaminated, attempting to
erratically wipe his face all over one officer as they
replaced him in the restraint chair.  Plaintiff's action
appeared to the officers as an attempt to bite, so they
hustled him a bit harder into the restraint chair-- though,
notably, without using excessive force, despite what
Plaintiff alleges.  In response, Plaintiff alleged that the
officers were choking him and handling him too aggressively

since he "was not resisting." Plaintiff was then rolled to
the hallway next to the control room, where there is
frequent travel by jail staff and thus, constant monitoring
by jail staff. (Doc. 25-1 at 4). Plaintiff was left in
the restraint chair[3] until he was adjudged to be calm enough
to no longer pose a threat to himself or others.

During the time that Plaintiff was in the restraint
chair, he alleges that he was forced to urinate on himself,
that the urine reactivated the mace, and he was left with
no medical attention to the alleviate the burning. (Doc. 9
at 6). The video evidence submitted by Defendants does not
indicate whether Plaintiff urinated on himself or not.

Around 9:05 p.m., Plaintiff was released from the
restraint chair and was escorted back to his cell to
retrieve his personal property so he could be moved to
another cell away from the other problem inmate Jacoby.
(Doc. 25-2 at 3). Plaintiff was instructed to gather his
things, but instead, Plaintiff refused and just sat on his

---

[3] According to Sheriff Mack's affidavit, "inmates in a
restraint chair are checked by nursing staff at least every
two hours. At the shift supervisor's discretion, inmates
are removed from the restraint chair and returned to their
cells. The Corrections Center policies regarding restraint
chairs are followed by all members of the Corrections
Center staff. Inmates, including Plaintiff, are never
placed in a restraint chair as punishment. Restraint
chairs are only utilized when an inmate threatens physical
harm to themselves, Corrections Center staff or another
inmate." (Doc. 25-1 at 4).

bed.  (*Id.*).  The second video recording begins here when the second extraction began.  As the officers approached Plaintiff's cell to move him, Plaintiff alleged that he was being discriminated against, but he gave no basis for that discrimination and continued to refuse to pack his things. (*See* Ex. H., Cell Move Track 2).  Additional backup was called and Plaintiff reluctantly complied.  During the move, Plaintiff repeatedly insulted Defendant McCall by calling him "Uncle Tom."  When an officer pointed out Plaintiff's unnecessary racist remarks, Plaintiff stated that he actually has an Uncle Tom and was referring to him in that sense.  (*Id.*).  Plaintiff further insulted McCall by referring to him as "boy" any time McCall instructed him to do something.  (*Id.*).

Once Plaintiff was secured alone in his new cell, the officers turned the intercom on and were able to hear Plaintiff flushing the toilet multiple times after apparently blocking the toilet in an attempt to flood his cell.  Defendant Means and McCall responded to the flushing and briefly sprayed Plaintiff indirectly with pepper spray to subdue him.  Plaintiff contends that he was "spray painted" with pepper spray down the back side of his body, stopping at his knees.  (Doc. 9 at 7).  Though the video does not show Plaintiff being "spray-painted" with mace,

13

the Court is aware that it could have happened prior to the recording starting. Whether Plaintiff was "spray-painted" or not, it is plain to see that Plaintiff had flooded his cell, posing a legitimate security concern, therefore, a longer burst of mace would not be unlikely or unnecessary in such a tumultuous situation.

Due to Plaintiff's aggressive attitude and refusal to cooperate, Means and McCall called for back up; however, in the meantime, Plaintiff broke the sprinkler head in his cell, causing the fire alarm to go off and water to begin pouring throughout the building. Both Plaintiff and other inmates began cheering. When the team of officers arrived at Plaintiff's cell, the situation was dangerous and chaotic. The lights were strobing, the alarms were going off, and the floors were extremely slippery due to the pouring water from the ceiling and the flooding toilet from Plaintiff's cell. The officers' ability to communicate was also impeded.

According to Defendant Means' affidavit, any time the officers attempt to remove Plaintiff from a situation, "he stiffens up and refuses to cooperate . . . It is very difficult and potentially dangerous to both the officers and the inmate to move somebody who is basically dead weight . . . (particularly when there is water

everywhere)." (Doc. 25-2 at 4). The officers dragged Plaintiff out of his cell, and sprayed him again with a longer burst of pepper spray since the first, shorter and indirect burst of spray was ineffective. Plaintiff was later decontaminated and placed in the restraint chair to prevent him from causing any more chaos. Plaintiff was yelling loudly during the entire event.

Even while in the restraint chair, Plaintiff continued to yell, "I'm not resisting! All I want to do is talk to a major! You're violating my constitutional rights!" (See Ex. H, Second Cell Extraction, Track 3). In an attempt to incite even more lunacy in the jail, Plaintiff hollered from the restraint chair to other inmates to break more sprinkler heads. (Doc. 25-10 at 1-5). In addition to potentially inciting a riot from the chair, Plaintiff threatened Defendant Robinson that he would kill Robinson's wife and children when he got out of prison. (Doc. 25-3 at 3). Defendant Robinson admittedly responded with his choice of profanity, but the two later apologized to each other for the words they exchanged. (*Id.*).

Against Defendant Mack, Plaintiff alleges deliberate indifference, failure to remedy a wrong, failure to train, and inadequate/unconstitutional policies/customs." (Doc. 9 at 12). Against Defendants Johnson, Rowell, Robinson, and

Means, he alleges deliberate indifference and excessive force. (*Id.* at 12-14). Against Defendant Scott, he alleges "failing to protect and/or intervene." (*Id.* at 14). For relief, Plaintiff requests "declaratory relief (Declaration the defendants violated Plaintiffs [sic] rights), Award punitive damages in the amount of $15,000 nominal damages, and compensatory damages ($25,000)." (Doc. 9 at 16). For the following reasons, the Court does not find sufficient evidence for trial or that Defendants violated Plaintiff's rights.

## II.  Discussion

In analyzing the propriety of a motion for summary judgment, the Court begins with the following basic principles. The Federal Rules of Civil Procedure grant this Court authority under Rule 56 to render "judgment as a matter of law" to the party who moves for summary judgment. FED.R.CIV.P. 56(a).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court must view the evidence produced by "the nonmoving party, and all factual inferences arising from it, in the light most favorable to" that party. *Barfield*

*v. Brierton*, 883 F.2d 923, 934 (11th Cir. 1989). However, Rule 56(e) states that:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
> (1) give an opportunity to properly support or address the fact;
> (2) consider the fact undisputed for purposes of the motion;
> (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or
> (4) issue any other appropriate order.

FED.R.CIV.P. 56(e). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . . If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (internal citations omitted). "Summary judgment is mandated where a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Custom Mfg. and Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 647 (11th Cir. 2007).

### A. Excessive Use of Force

To establish an Eighth Amendment claim, a plaintiff must prove both an objective and subjective component. First, the wrongdoing must be objectively "harmful enough" to establish a constitutional violation, and second, a plaintiff must show that "the officials act[ed] with a sufficiently culpable state of mind," *i.e.,* they acted "maliciously and sadistically to cause harm."  *Hudson v. McMillian,* 503 U.S. 1, 6-8 (1992).  The Court will analyze the objective component first.

The objective component of an excessive force claim "necessarily excludes from constitutional recognition *de minimus* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind."  *Id.*  Consequently, Plaintiff may only recover compensatory and punitive damages if he sustained an injury that is greater than *de minimis* as a result of the Defendants' use of force*.  Harris v. Garner, supra*, 190 F.3d 1279, 1286 (11th Cir. 1999), *vacated, reh'g granted en banc,* 197 F.3d 1059 (11th Cir. 1999), *vacated in part and reinstated in part on reh'g,* 216 F.3d 970 (11th Cir. 2000).  Though *Hudson* did not define *de minimus*, it did suggest "that [the] degree of injury received is relevant to determining whether more than *de minimus* uses of physical

force was used." *Milton v. Delmore,* 2012 WL 750755, at *3 (S.D.Ala. Feb. 13, 2012)(unpublished)(citation omitted).

The Court does not find that Plaintiff has suffered an injury greater than *de minimis* as a result of any of Defendants' actions. "This Court has evaluated other prisoner injuries to determine whether the use of force was excessive or not, and found that more severe uses of force than that complained of by Plaintiff were insufficient to constitute excessive force."[4] *Id.* Plaintiff does not allege any lasting or ongoing injuries as a result of these situations he created or the amount of force used to eradicate them; nor have any medical records been provided which indicate such an injury. There is no indication that Plaintiff requested to see a doctor or to receive medical care (beyond wiping his eyes of the mace) as a result to any of the events that took place. Plaintiff does not allege a single scratch, cut or bruise.

---

[4] *See Walker v. Thames,* 2001 WL 394911, *6 (S.D.Ala. Mar. 30, 2001)(unpublished)(finding where a scratch resulting from a correctional officer's pushing, shoving, and hitting in order for the inmate to get back to work did not constitute excessive force); *Lanier v. Fralick,* 2000 WL 1844679, *1-2, 5-6 (S.D.Ala. Oct. 24, 2000)(unpublished) (finding where plaintiff received scratches on the elbow, skin tearing behind the ear, abrasion on the shoulder, and felt jaw pain resulting from a correctional officer pushing plaintiff into a glass window while taking plaintiff to a holding cell did not constitute excessive force).

Even a liberal construction of Plaintiff's Complaint does not satisfy the "more than *de minimis* injury" inquiry to sustain a claim for compensatory or punitive damages as a result of being pepper sprayed or placed in a restraint chair. Therefore, the Court finds that Plaintiff has failed to satisfy the objective component, and that Defendants' use of force was *de minimus* and not of the sort repugnant to the conscience of mankind. *See Hudson* at 9-10. Given that Plaintiff must prove *both* objective and subjective prongs of an Eighth Amendment analysis, the Court will end its inquiry here, and not address the subjective element.

Likewise, given the Court's finding that Defendants' use of force was not excessive, it follows that Plaintiff's claims for deliberate indifference and failure to protect and/or intervene fail as a matter of law. Plaintiff also fails to provide a single shred of evidence sufficient to prove that Defendant Mack failed to supervise his employees or that he maintained inadequate policies or customs at the jail. Plaintiff even admitted in the interview videos that he was pleased with the way his complaints were being handled by jail staff. (*See* Ex. F).

In addition to the Court's initial finding that Plaintiff fails to meet his burden of proof, the Court finds Plaintiff's allegations to be conclusory and

unsupported by the record, and it is well settled that a conclusion cannot be taken as true. *Ashcroft v. Iqbal,* 556 U.S. 662, 678-79 (2009); *see also Leigh v. Warner Bros., Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000)("[t]his court has consistently held that conclusory allegations without specific supporting facts have no probative value"); *Fullman v. Graddick,* 739 F.2d 553, 556-57 (11th Cir. 1984)(a plaintiff's mere verification of conclusory allegations is not sufficient to oppose a motion for summary judgment).

Furthermore, the Court finds Plaintiff's version of events to be completely radical and fantastical, and wholly rebutted by the audio and video evidence submitted by Defendants. As a result, the Court does not accept as true Plaintiff's version of the events in question, and instead, relies wholly on Defendants' evidentiary submissions. *See Scott v. Harris*, 550 U.S. 372, 380 (2007)("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Vicks v. Knight*, 380 Fed. Appx. 847, 851 (11th Cir. 2010)(unpublished).

Adopting Defendants' evidence as the appropriate

version of the facts for the purposes of ruling on this Motion for Summary Judgment, the Court finds that there has been no constitutional violation of Plaintiff's rights, and that his claims fail completely as a matter of law. There is no evidence which would favor Plaintiff's version of the situation, and thus, the Court finds that no jury could return a verdict in Plaintiff's favor based on the evidence presented.

## III. Conclusion

Based on the foregoing, the Court recommends that Defendants' Motion for Summary Judgment be granted, and that each claim in Plaintiff's Complaint be dismissed with prejudice as to each Defendant.

## NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72(B); S.D. ALA. L.R.72.4. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the

basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

DONE this 8th day of December, 2014.

s/BERT W. MILLING, JR.
UNITED STATES MAGISTRATE JUDGE